# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| VICTOR DONNELL FIELDS, | Case No. 17-cv-2662-WMW-KMM |
| Plaintiff, | |
| v. | |
| STEPHEN HUOT, Director Behavioral Health Services; NANETTE LARSON, Health Services Director; DIANE MEDCHILL, Program Administrator/Associated Director of Behavioral Health Services; MICHELLE SAARI, WOOC-Psychology Services Director; SHARLENE LOPEZ, Program Director; KRISTIN MUHL, In Patient Unit Director; BRONSON AUSTRENG, Correctional Officer/Case Manager; LON AUGDAHL, Psychiatric Physician; JEFF TITUS, Warden; GREGG SMITH, Associate Warden Operations; JOHN DOES; | **REPORT AND RECOMMENDATION** |
| Defendants. | |

This matter is before the Court on: (1) the Motion for Summary Judgment filed by the Defendants Stephen Huot, Nanette Larson, Diane Medchill, Michelle Saari, Sharlene Lopez, Kristin Muhl, Bronson Austreng, Jeff Titus, and Greg Smith (collectively "DOC Defendants") (ECF No. 115); and (2) Defendant Lon Augdahl, M.D.'s Motion for Summary Judgment (ECF No. 161). For the reasons that follow, the Court recommends that the motions for summary judgment be granted and this case be dismissed.

## I.    The Summary Judgment Standard

Summary judgment is appropriate when, drawing all reasonable inferences in favor of the nonmoving party, the record shows that there is no genuine issue as to any material fact and that

the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The party seeking summary judgment must demonstrate the absence of any genuine issue of material fact. *Celotex*, 477 U.S. at 322. When the moving party properly supports a motion for summary judgment, the nonmoving party must present admissible evidence showing that specific facts exist creating a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Wingate Cnty. Sch. Dist., No. 34*, 528 F.3d 1074, 1078-79 (8th Cir. 2008). If the record as a whole would not permit a "rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## II.    The Summary Judgment Record

Victor Fields brings this action pursuant to 42 U.S.C. § 1983, claiming that the defendants violated his rights under the Eighth and Fourteenth Amendments to the United States Constitution. Mr. Fields is currently confined at the Minnesota Correctional Facility in Rush City, Minnesota ("MCF-Rush City"). He is serving a life sentence for first-degree murder, which was imposed on October 4, 2002. *State v. Fields*, 679 N.W.2d 341 (Minn. 2004).

### A.    The First Amended Complaint

On February 17, 2018, Mr. Fields filed his First Amended Complaint identifying the nature of his claims against the DOC Defendants and Dr. Augdahl. (Am. Compl., ECF No. 44.) Mr. Fields claims that he suffers from "sexual exhibitionism, sexual impulse control dysfunction, and depression." (Am. Compl. ¶ 7.) He alleges that the defendants violated his constitutional right to receive adequate care for these issues because they have refused to provide him necessary therapy and treatment. He also alleges that the defendants denied him appropriate

2

mental-health treatment because of his race in violation of his constitutional right to equal protection. (Am. Compl. at 1–2, ¶ 1.)

Although the Amended Complaint does not state it explicitly, Mr. Fields has clarified the specific nature of his claims through the course of this litigation. He claims that the DOC Defendants have unconstitutionally prevented him from being treated by female therapists. Mr. Fields asserts that each of the DOC Defendants can ensure that he receives mental-health care from female providers. (Am. Compl. ¶¶ 19–60, 68–82.) However, the DOC Defendants have refused his requests for such treatment and recently insisted that a corrections officer be present when he receives medical exams, interviews, consultations, sick calls, and other medical appointments. (Am. Compl. ¶ 69.) He further alleges that the DOC Defendants allow other inmates, who are not African Americans, to receive mental-health treatment from female therapists. (Am. Compl. ¶¶ 99–103; Pl.'s Opp'n to DOC Mot. for Summ. J. ("Pl.'s Opp'n") at 6–7, 12–13, 20, ECF No. 153.)

Mr. Fields similarly claims that Dr. Augdahl was deliberately indifferent to his need for treatment for his mental-health issues and denied him care because of his race in violation of the Equal Protection Clause. (Am. Compl. ¶¶ 99–100.) More specifically, he alleges that Dr. Augdahl "stopped Plaintiff from receiving the psychiatric medication Lexapro. He also noted to medical to stop/reduce all [of] Plaintiff's medication used to treat his life threatening illness (severe hypertension)." (Am. Compl. ¶ 61.)

### B.    The Summary Judgment Record

The DOC Defendants and Dr. Augdahl submitted evidence in support of their motions for summary judgment as required by Federal Rule of Civil Procedure 56(c). The record includes DOC documents discussing Mr. Fields's disciplinary history while he has been held at several

3

prison facilities as well as medical records that detail his mental-health treatment. These records generally show that at times during his incarceration, Mr. Fields received individual therapy services from female providers, but due to his behavior, the DOC repeatedly reassigned him to receive therapy from male therapists exclusively. Mr. Fields consistently objected to that decision and submitted written requests asking to meet with female mental-health providers. The DOC denied these requests, citing Mr. Fields's history of inappropriate sexual behavior and relevant disciplinary history.

Mr. Fields has served his sentence at four DOC prisons since his incarceration in 2002. He was at MCF-St. Cloud in 2002; at MCF-Stillwater until 2009; at MCF-Oak Park Heights from 2009 until 2017; and is now at MCF-Rush City. (*See* Lopez Aff., Ex. 1, ECF No. 120.) The following discussion summarizes the evidence relevant to Mr. Fields's claims while he was at these institutions.

### 1. MCF-St. Cloud and MCF-Stillwater

Mr. Fields began his sentence at the Minnesota Correctional Facility in St. Cloud, Minnesota. (Backes Aff. ¶ 9(a), ECF No. 128.) At intake, DOC staff found that he had "no critical mental health related issues and ... it did not appear that he had ever been seen by a therapist or psychiatrist prior to his incarceration." (Backes Aff. ¶ 9(a).) However, on November 18, 2002, Mr. Fields was diagnosed with an adjustment disorder with anxious and depressed mood. (Backes Aff. ¶ 9(a).) No records suggest that he requested or received additional mental-health treatment until 2004.

In 2004, while at MCF-Stillwater, Mr. Fields reported experiencing suicidal ideation and depression and was prescribed psychiatric medication. (Backes Aff. ¶ 9(b); Lopez Aff., Ex. 1; Lopez Aff. ¶¶ 6, 11(a), ECF No. 118.) Mr. Fields was initially assigned a female therapist, Kara

4

Richter, but on March 30, 2005, behavioral health staff "received credible reports that [he] intended to sexually assault [Ms. Richter]." (Backes Aff. ¶ 9(c); Lopez Aff., Ex. 6 at 1, ECF No. 126.) As a result of the report, DOC assigned Mr. Fields a male therapist, Ronald Weill. (Lopez Aff. ¶ 11(a).) Mr. Weill provided primary therapeutic treatment for Mr. Fields until 2009. (Backes Aff. ¶ 9(d).)

Mr. Fields complained that he had been reassigned to a male therapist. (Lopez Aff. ¶ 11(c).) In May of 2008, Mr. Fields told Mr. Weill that he believed it was unfair that he was assigned a male therapist based on the allegation that he intended to assault Ms. Richter. Mr. Fields denied that he had done so and stated that he could not be open with a male therapist. (Lopez Aff., Ex. 6 at 4.) Mr. Weill noted that Mr. Fields already had three prior disciplinary incidents of inappropriate sexual behavior. (Lopez Aff., Ex. 6 at 4.) In one of those incidents, the DOC found that Mr. Fields had been dishonest when he claimed that a female officer touched him inappropriately. In another, Mr. Fields was disciplined for inappropriately touching himself while staring at a female corrections officer. (Lopez Aff., Ex. 6 at 3.)

In June 2008, Mr. Fields claimed the decision to prevent him from seeing a female therapist was discriminatory. (Lopez Aff., Ex. 6 at 5.) Reviewing his request, the psychology staff at MCF-Stillwater unanimously agreed that Mr. Fields should not be re-assigned to a female therapist based on his disciplinary history. (Lopez Aff., Ex. 6 at 8; Lopez Aff. ¶ 11(e).)

However, a little over a year later, on July 22, 2009, Mr. Fields's request for a therapist reassignment was granted, and he began receiving individual therapy from Kathryn Lockie. (Lopez Aff. ¶ 11(f) & Ex. 6 at 9.) In November 2009, Ms. Lockie's notes indicate that she had attempted for several months to establish a specific treatment goal with Mr. Fields, but he had "crossed boundaries with [her]" by "expressing his romantic feelings for [her]." (Lopez Aff.,

5

Ex. 6 at 10.) Mr. Fields also read Ms. Lockie a poem he had written about her that was "romantic in nature." (Backes Aff., Ex. 5 at 56, 59.) Ms. Lockie concluded that "[Mr. Fields] requested a female therapist with the ulterior motive being to hit on them and attempt to engage in a romantic relationship." (Lopez Aff., Ex. 6 at 10.) Ms. Lockie also declined his request to be referred to another therapist for similar reasons. (*See* Lopez Aff., Ex. 6 at 11.)

### 2. MCF-Oak Park Heights

Mr. Fields was transferred to MCF-Oak Park Heights on November 18, 2009, and he was assigned to receive therapy services from another female provider, Tammy Lisowy. (Lopez Aff. ¶ 11(h).) After meeting with him, Ms. Lisowy agreed with Ms. Lockie's previous assessment that Mr. Fields lacked a genuine motivation to change his behaviors, including his stated goal of being able to interact appropriately with women. (Lopez Aff., Ex. 6 at 13–15.) She specifically agreed with Ms. Lockie's that Mr. Fields had "an ulterior motive to have access to a female therapist in an attempt to hit on them or pursue a romantic relationship with them." (Lopez Aff., Ex. 6 at 15.)

Ms. Lisowy recommended discontinuing Mr. Fields's individual therapy sessions. In response, he complained that he was not being provided necessary care. (Lopez Aff., Ex. 6 at 17.) The DOC Psychological Services Director, Peter Puffer, responded to Mr. Fields's complaint, explaining that Mr. Fields had been seen by several providers. Director Puffer observed that Mr. Fields was generally noncompliant with treatment, did not put forward effort to change, and had not demonstrated a legitimate need for services. (Lopez Aff., Ex. 6 at 17.) In a follow-up note, Director Puffer explained that "[Mr. Fields] clearly has boundary issues with female staff – he has made inappropriate verbal advances, exposed his penis to female staff and allegedly threatened to rape a former female therapist." (Lopez Aff., Ex. 6 at 18.) On February

23, 2010, the DOC psychology staff found that Mr. Fields was "not appropriate for services at [that] time." (Lopez Aff., Ex. 6 at 18.)

On March 18, 2010, Mr. Fields sent a kite to Ms. Lisowy that asked personal questions and explained why he believed it was important for him to interact with women. (Lopez Aff. ¶ 11(j).) Specifically, he stated that he believed he needed to have sex and that he could not be expected to interact appropriately with female staff unless he was given such an outlet. (Lopez Aff., Ex. 6 at 19–20.) Ms. Lisowy responded to Mr. Fields with a memo directing him not to contact her again or she would write him up formally. (Lopez Aff., Ex. 6 at 24.)

Around the same time, Mr. Fields was reassigned to be seen by a male provider, Psychologist Kenneth Carlson, who addressed the inappropriate message Mr. Fields sent to Ms. Lisowy. (Backes Aff. ¶ 9(f); Lopez Aff. ¶ 11(k).) Dr. Carlson's notes indicate that "when working with a female therapist, [Mr. Fields] views the male-female relationship as much more important than the therapist-client relationship." (Lopez Aff., Ex. 6 at 29.)

Despite Ms. Lisowy's warning that Mr. Fields could face discipline if he continued to contact her with inappropriate messages, he again wrote her a sexually graphic kite[1] on April 28, 2010. (Lopez Aff., Ex. 6 at 24.) Mr. Fields told Dr. Carlson that he could not accept written messages from women directing him not to contact them as representing their true instructions. (Lopez Aff., Ex. 6 at 32.) Dr. Carlson cautioned Mr. Fields against further "psychological stalking of female therapists," and Mr. Fields stated that he was "just following his natural, God-given instincts." (Lopez Aff., Ex. 6 at 33.)

---

[1]     In DOC prisons, an inmate can ask to be seen by a member of the Behavioral Health Services staff by submitting a Health Services Offender Kite form. (Backes Aff. ¶ 7.)

Ms. Lisowy filed a formal notice of violation based on Mr. Fields's April 28, 2010 communication, and a disciplinary hearing was held on May 4, 2010. (Lopez Aff., Ex. 6 at 23–24.) Mr. Fields admitted the kite was his but denied that there was anything abusive or harassing about his behavior, insisting that he had a right to express himself. (Lopez Aff., Ex. 6 at 23.) The hearing officer found Mr. Fields guilty of violating prison rules by a preponderance of the evidence and he was sentenced to 45 days of segregation time. (Lopez Aff., Ex. 6 at 23.)

Around the same time, Mr. Fields sent Ms. Lockie a letter that was both harassing and intimidating. (Lopez Aff., Ex. 6 at 28.) At the disciplinary hearing regarding the violation, Mr. Fields did not deny writing the letter, but he did not feel it was inappropriate. (Lopez Aff., Ex. 6 at 27.) He stated that he wanted Ms. Lockie to know that he had information about her and told her that he tried to contact her at her other job. (Lopez Aff., Ex. 6 at 27.) Again, Mr. Fields was punished with segregation time. (Lopez Aff., Ex. 6 at 27.)

Mr. Fields continued to request that he be seen by female therapists while he met with Dr. Carlson between March 2010 and January 2013. The DOC records indicate he was often fixated on sexual thoughts. (Lopez Aff. ¶ 11(l); Lopez Aff., Ex. 6 at 29–69.) Mr. Fields also engaged in several incidents of sexually inappropriate behavior toward female DOC staff members. (Lopez Aff. ¶¶ 11(m)–(p).) His behavior included making sexually inappropriate comments to a female corrections officer, obtaining personal information (including home addresses) about DOC staff members, and writing threatening and sexually explicit communications to female staff. (Lopez Aff ¶¶ 11(m)–(p); Lopez Aff., Ex. 6 at 70–91.)

In January 2013, Mr. Fields was again reassigned to Ms. Lockie for therapy. (Backes Aff. ¶ 9(g).) Ms. Lockie met with Mr. Fields for several sessions, but she noted that he did not appear to benefit from them. (Lopez Aff. ¶ 11(q).) Several months later, on May 31, 2013, Mr. Fields

was placed into the ACU after he was charged with violating disciplinary rules for sexually assaulting a nurse that was treating him in the health services department. (Lopez Aff., Ex. 6 at 93.) That incident ultimately resulted in Mr. Fields receiving a disciplinary sentence of 600 days segregation. (Lopez Aff. ¶ 11(r); Lopez Aff., Ex. 6 at 103–09.) During a May 31st meeting with Ms. Lockie, he admitted that he had sexually assaulted the nurse. (Lopez Aff., Ex. 6 at 93.) Ms. Lockie observed that the "incident appeared to be thought out [and] Mr. Fields had previously disclosed having thoughts of this nature," which is reflected in some of Ms. Lockie's notes during the months preceding the incident. (Lopez Aff., Ex. 6 at 93; Lopez Aff., Ex. 6 at 94–102.)

Mr. Fields continued to write sexually inappropriate kites concerning female members of DOC staff in August 2013, leading to additional disciplinary sanctions. (Lopez Aff. ¶¶ 11(s)–(t); Lopez Aff., Ex. 6 at 111–30.) On September 3, 2013, Ms. Lockie indicated that in response to kites Mr. FIelds sent to staff members, she would no longer be providing him individual therapy and he would not be assigned to another therapist. (Lopez Aff., Ex. 6 at 131.) Mr. Fields objected to that decision. (Lopez Aff. ¶ 11(v); Lopez Aff., Ex. 6 at 137–39.) Mr. Fields responded with additional kites stating that he was hearing voices, but Ms. Lockie noted that he had not been diagnosed with any psychotic disorder. (Lopez Aff. ¶ 11(w).)

In February 2014, Mr. Fields was found to have violated prison disciplinary rules again based on inappropriate sexual behaviors directed at female staff. On three occasions, Mr. Fields openly masturbated in his cell when the staff members approached his door. (Lopez Aff. ¶¶ 11(y), (z) & (aa).) He engaged in similar behavior in June 2014. (Lopez Aff. ¶¶ 11(cc)-(dd).)

In May 2014, Mr. Fields began receiving individual therapy sessions with Psychologist Daniel Paskewitz. (Lopez Aff. ¶ 11(bb).) He told Dr. Paskewitz that he was having violent

9

sexual fantasies, and Dr. Paskewitz ultimately recommended that he only be seen by male staff. (Lopez Aff., Ex. 6 at 163.) Mr. Fields told Dr. Paskewitz that Ms. Lockie was discriminating against him on the basis his race. (Lopez Aff., Ex. 6 at 166.)

In December of 2014, as part of her role as Correction Program Director, Sharlene Lopez again assigned Mr. Fields to a female therapist, Angela Newstrom. (Lopez Aff. ¶ 11(ee).) Due to his past behavior, however, Director Lopez told Mr. Fields that he needed to be clear about treatment expectations. She had Mr. Fields review a document that outlined those expectations in individual paragraphs. One of the paragraphs, excerpted below, required Mr. Fields to agree that he would cease the inappropriate behaviors he had exhibited throughout his time in DOC prisons:

> You will not engage in any inappropriate sexual activity/behavior while meeting with your Clinical Program Therapist (CPT) or other Behavioral Health Staff. Inappropriate sexual activity/behavior includes, but is not limited to masturbation, groin rubbing, etc. Your hands will remain in staff view at all times.

(Lopez Aff. ¶ 11(ee); Lopez Aff., Ex. 6 at 182.) Mr. Fields signed the agreement, though he now asserts that Director Lopez "threatened and coerced" him into doing so. (Lopez Aff., Ex. 6 at 176; *see* Am. Compl. ¶ 44.)

Ms. Newstrom provided Mr. Fields individual therapy from January 2015 through September 2015. Mr. Fields engaged in manipulative behavior and he attempted to discuss issues of a sexual nature that he was repeatedly told were off limits. (Lopez Aff. ¶ 11(ff); Lopez Aff., Ex. 6 at 183–206.) Ms. Newstrom regularly noted that Mr. Fields was not motivated to improve his mental health, and she concluded that he was using the sessions to spend time with a female staff member. (*Id.*) Mr. Fields reported hallucinating a clone of Ms. Newstrom that he referred to as "Angelina," but Ms. Newstrom did not credit these reports. (*Id.*) During that same time period,

10

Mr. Fields received multiple disciplinary citations for inappropriate sexual behavior, including openly masturbating at his cell door when female officers approached and making sexual comments to female staff members. (Lopez Aff. ¶¶ 11(gg)–(mm).)

Between October 5 and 16, 2015, Mr. Fields sent six inappropriate, threatening, and sexually explicit letters to "prosecuting attorneys, legislative representatives, a commissioner, and private citizens." (Lopez Aff. ¶ 11(oo).) Some of the letters included Mr. Fields's bodily fluids. The letters also contained threats of physical and sexual violence unless the recipients "sen[t] him money and sexually explicit photographs of themselves." (Lopez Aff. ¶ 11(oo); Lopez Aff., Ex. 6 at 244–45.) Based on these letters, Mr. Fields was again charged with violating several prison disciplinary rules. He denied the charges at a disciplinary hearing, claiming that "God made me do it." He was found to have committed each of the violations and given a disciplinary sentence of 345 days segregation. (Lopez Aff., Ex. 6 at 234–45.)

Psychologist Terrel Backes began seeing Mr. Fields in the latter half of 2015 and eventually became his primary therapist due to his continued inappropriate behaviors toward female staff. (Lopez Aff. ¶ 11(nn); Backes Aff. ¶ 9(j).) In October 2015, Mr. Fields told Mr. Backes that he had a sexual relationship with Ms. Newstrom's clone "Angelina" and that he did not appreciate it when others doubted that he actually experienced the hallucination. Mr. Backes concluded that Mr. Fields's behavior during their meetings suggested feigning of symptoms. (Backes Aff., Ex. 5 at 158–59; Backes Aff., Ex. 5 at 109, 115–16.)

Toward the end of October 2015, Mr. Fields again complained that he was being prohibited from meeting with a female therapist based on his race. (Backes Aff., Ex. 5 at 149.) Mr. Fields frequently refused to interact with Mr. Backes during their encounters and demanded to be seen by Ms. Newstrom. (*E.g.*, Backes Aff., Ex. 5 at 81–83, 92, 98, 123, 132, 138, 140–43,

145–47.) Mr. Backes explained to him that his treatment team had concluded it would be inappropriate for him to work with female staff. (*E.g.*, Backes Aff., Ex. 5 at 103.)

In all, Mr. Backes met with Mr. Fields for 43 therapeutic sessions. Based on those encounters and a review of Mr. Fields's entire file, Mr. Backes concluded that Mr. Fields does not suffer from any clinical disorder other than a personality disorder. (Backes Aff. ¶¶ 10–11; Backes Aff., Ex. 5 at 70–159.) In a lengthy and detailed report in February 2016, Mr. Backes concluded that Mr. Fields did not need regular psychotherapy and noted that "his extensive history suggests that he primarily seems to report a variety of symptoms in an effort to pursue contact with female behavior health staff ... in a markedly calculating, predatory manner." (Backes Aff., Ex. 5 at 70–78.)

Mr. Backes last met with Mr. Fields on December 29, 2016. (Backes Aff., Ex. 5 at 79.) At that time, Mr. Fields was diagnosed with an antisocial personality disorder; moderate alcohol use disorder; and sexual abuse of an adult. (Backes Aff., Ex. 5 at 79.) Mr. Backes's notes specifically clarified that Mr. Fields does not have a dysthymic disorder or a paraphilic disorder. (Backes Aff. ¶ 10; *see also* Huot Aff. ¶ 8 ("Plaintiff has not been diagnosed with any paraphilic disorder while incarcerated in the DOC, including sexual exhibitionism or sexual impulse control dysfunction.").)

Mr. Fields had additional disciplinary incidents in April of 2016, when he masturbated in front of Director Lopez. Director Lopez's report about the incident was eventually withdrawn because Mr. Fields had already received disciplinary sanctions placing him on segregation status through February of 2020. (Lopez Aff. ¶ 15; Lopez Aff., Ex. 6 at 258–60.)[2]

---

[2]    Mr. Fields alleges that Ms. Lopez was aware of his "mental health conditions, in fact, she
(footnote continued on following page)

12

Mr. Fields's inappropriate conduct continued unabated. Almost two weeks later, Mr. Fields sent Ms. Newstrom yet another a kite with sexually inappropriate comments and threats. (Lopez Aff., Ex. 6 at 261–63.) And Mr. Fields continued exposing and inappropriately touching himself in front of female staff members in February of 2017. (Lopez Aff. ¶¶ 11(uu)–(vv).) In March 2017, Mr. Fields attempted to obtain personal information regarding a staff member from a person outside the DOC, and he wrote another sexually explicit poem, suspected to be about a female staff member. (Lopez Aff. ¶¶ 11(xx); Lopez Aff., Ex. 6 at 274–79.) Similar behaviors continued throughout his remaining time at MCF-Oak Park Heights. (Lopez Aff. ¶¶ 11(yy)–(aaa).)

In early 2017, Mr. Fields was assigned a new therapist, Patrick Hoel. (Backes Aff. ¶ 9(l).) Mr. Hoel met with Mr. Fields several times between February and September 2017, but rather than engage in these sessions, Mr. Fields continued to complain that female staff would not work with him. (Backes Aff., Ex. 5 at 170–76.) Mr. Hoel reviewed Mr. Fields's complete mental-health record in March 2017 and wrote a detailed assessment. (Backes Aff., Ex. 5 at 177–78.) Like other evaluators, Mr. Hoel found that Mr. Fields exhibited antisocial personality disorder with narcissistic and histrionic traits, an alcohol abuse disorder that was in remission, and sexual abuse of an adult. (Backes Aff., Ex. 5 at 178.) Mr. Hoel concluded that Mr. Fields was not "appropriate for regular psychotherapy at [that] time[, but he should] receive regular mental health monitoring while he resides in segregation as per policy." (Backes Aff., Ex. 5 at 178.)

---

reported an act between her and the plaintiff on April 1, 2016 when she came to see plaintiff and he received no discipline for his mental health conditions." (Am. Compl. ¶ 48.)

### 3. MCF-Rush City

On October 4, 2017, Mr. Fields was transferred to MCF-Rush City, where he continued to engage in inappropriate behavior. (Lopez Aff., Ex. 1 at 2; Lopez Aff. ¶ 11(bbb).) He repeatedly openly masturbated in front of female officers and touched himself inappropriately while a female nurse checked his blood pressure. (Lopez Aff. ¶ 11(bbb); Lopez Aff., Ex. 6 at 286–91.)

Mr. Fields was initially assigned another male therapist, Matthew Marsh. (Backes Aff. ¶ m.) In his initial report, Mr. Marsh noted the DOC's determination "that Mr. Fields would be met with exclusively by male behavioral health providers as part of a behavioral health team to mitigate his risk of harm to others...." (Backes Aff., Ex. 5 at 187.) Mr. Marsh concluded that Mr. Fields was not amenable to psychotherapy at that time based on his disciplinary history and his manipulation of behavioral health services. (Backes Aff., Ex. 5 at 188.)

On November 1, 2017, Mr. Marsh met with Mr. Fields to discuss his current mental health-functioning. (Backes Aff., Ex. 5 at 185–86.) Mr. Fields stated that extended time in segregation was causing him to feel depressed, and denied engaging in any conduct that violated prison rules. (Backes Aff., Ex. 5 at 185.) Mr. Fields claimed that his mental-health conditions caused him to engage in the behaviors that resulted in discipline and that his conduct was necessary to alleviate his symptoms. Mr. Marsh reiterated to Mr. Fields that "he has the capacity to remain appropriate with staff and follow expectations for behavior." (Backes Aff., Ex. 5 at 185.)

Mr. Marsh met with Mr. Fields on January 16, 2018, in response to a kite suggesting that Mr. Fields was having thoughts of self-harm. However, Mr. Fields was not found to present a danger to himself. (Backes Aff., Ex. 5 at 183–84.) Mr. Fields renewed his request to receive

mental-health services from female staff members, and Associate Warden Greg Smith also met

with Mr. Fields and explained that this request would be denied based on his behavioral history.

(Backes Aff., Ex. 5 at 181–82.)[3]  Mr. Fields declined to meet with Mr. Marsh at a regularly

scheduled follow-up on April 17, 2018. (Backes Aff., Ex. 5 at 180.)

### 4.   Stephen Huot's Interactions with Plaintiff

Mr. Fields alleges that he sent Stephen Huot, the Director of Behavioral Health at the

DOC, several requests for mental-health treatment, but Director Huot denied him care. (Am.

Compl. ¶¶ 19–24.) Director Huot notes that Mr. Fields has asked to be civilly committed as a sex

offender so he can receive sex-offender treatment, but he has not been committed to the

Minnesota Sex Offender Program. (Huot Aff. ¶¶ 6, 11, ECF No. 133.) None of Mr. Fields's

medical providers has diagnosed him with a paraphilic disorder, but Director Huot indicates that

if Mr. Fields had such a diagnosis, the DOC would provide appropriate mental-health treatment

for it. (Huot Aff. ¶¶ 8,10.) Even if he had such a diagnosis, there are no treatments available at

the DOC that allow an inmate to "masturbate or perform any sexual act in the presence of a

therapist." (Huot Aff. ¶ 9.)

On several occasions, Director Huot addressed concerns raised by Mr. Fields. On

December 4, 2013, he responded in writing to a request Mr. Fields sent to the Commissioner of

the Minnesota Department of Human Services asking to be civilly committed as a psychopathic

personality. (Huot Aff., Ex. 3, ECF No. 136.) He informed Mr. Fields that treatment would

require him to demonstrate a willingness to stop engaging in threatening behavior toward staff.

---

[3]    Mr. Fields alleges that Associate Warden Smith met with him on January 17, 2018 and
told Mr. Fields that a corrections officer would be present at the time of any therapy session to
interfere with those interactions and that Mr. Fields would not receive the counseling needed to
treat his mental health conditions. (Am. Compl. ¶ 69.)

(Huot Aff., Ex. 3.) On January 15, 2015, Director Huot again responded to a letter from

Mr. Fields, explaining that Mr. Fields could receive therapeutic services if he agreed to engage in

no sexually inappropriate behavior. (Huot Aff., Ex. 4, ECF No. 138.) Mr. Fields later objected

that he was removed from Ms. Newstrom's caseload, and on May 23, 2016, Director Huot wrote

to Mr. Fields, explaining, among other things, his continued support for the efforts of staff at

MCF-Oak Park Height to provide appropriate therapy even if Mr. Fields continued "to refuse to

cooperate." (Huot Aff., Ex. 5, ECF No. 140.) Director Huot denied additional requests from

Mr. Fields in August 2016 and January 2017. (Huot Aff., Ex. 6, ECF No. 142; Huot Aff., Ex. 7,

ECF No. 144.) In January, he reiterated that behavioral health staff remained willing to work

with Mr. Fields if he was "inclined to cooperate." (Huot Aff., Ex. 7.)

### 5. Treatment from Dr. Lon Augdahl

Dr. Lon Augdahl provided treatment for Mr. Fields from August 2015 through January

2016. (Backes Aff. ¶ 9(k); Novak Aff., Ex. A at 7–10, ECF No. 165.) Dr. Augdahl reviewed

notes from Ms. Newstrom, Mr. Backes, and Director Lopez, including the treatment plan that

Mr. Fields signed acknowledging the expectation that he would refrain from inappropriate sexual

activity or behavior as a condition of receiving individual therapy. Dr. Augdahl noted that

Mr. Fields "has a long history of inappropriate sexual behaviors including recently masturbating

in front of female staff." (Novak Aff., Ex. A at 7.) Like other providers who saw Mr. Fields,

Dr. Augdahl concluded that he was likely feigning his claimed hallucinations and noted that

Mr. Fields did not request any specific medication. (Novak Aff., Ex. A at 9.) He diagnosed

Mr. Fields with a persistent depressive disorder, a possible anxiety disorder, and antisocial

personality disorder with histrionic personality features. (Novak Aff., Ex. A at 9.) Dr. Augdahl

started Mr. Fields on 10mg of Lexapro daily with the goal of decreasing some depressive symptoms. (Novak Aff., Ex. A at 10.)

Dr. Augdahl met Mr. Fields again on September 16, 2015. (Novak Aff., Ex. A at 5–6.) On September 7th, Mr. Fields had been placed on constant observation status after a suspected suicide attempt. (Novak Aff., Ex. A at 5.) He increased Mr. Fields's dosage of Lexapro from 10mg to 15mg daily. (Novak Aff., Ex. A at 6.)

In October 2015, Dr. Augdahl followed up with Mr. Fields. After Dr. Augdahl increased the dosage of Lexapro in September, Mr. Fields wrote several inappropriate kites to female staff that were violent and sexually explicit. (Novak Aff., Ex. A at 3.) Dr. Augdahl attributed the hypersexual conduct to the increased dosage of Lexapro. (Novak Aff., Ex. A at 4.) He also observed no manic or hypomanic symptoms and suggested a change in diagnosis to: "[r]ule out unspecified depressive disorder." (Novak Aff., Ex. A at 3, 4.) Dr. Augdahl decreased Lexapro to 5mg daily to taper Mr. Fields off the medication, which would be discontinued after seven days. (Novak Aff., Ex. A at 4.) In a follow-up appointment, Dr. Augdahl found that Mr. Fields did not have "a significant Axis I affective disorder that would respond to antidepressant medications." (Novak Aff., Ex. A at 2.) Dr. Augdahl did not recommend any psychiatric medications, but suggested that Mr. Fields continue to work with Dr. Backes for individual therapy. (Novak Aff., Ex. A at 2.)

## III.    Analysis

The DOC Defendants and Dr. Augdahl argue that they are entitled to summary judgment on Mr. Fields's constitutional claims. They contend that no reasonable jury could find in Mr. Fields's favor because they provided him with adequate mental-health treatment and there is no evidence indicating that he was treated differently from similarly situated inmates because of

his race. In opposition to these motions, Mr. Fields filed several documents, which have been

considered by the Court, keeping Mr. Fields's status as a pro se litigant in mind. (Pl.'s Letter to

Menendez, M.J., ECF No. 151; Pl.'s DOC Opp'n, ECF No. 153; Pl.'s Exs., ECF No. 154; Pl.'s

Statement Regarding Mental Health Records, ECF No. 172; Pl.s' Mem. in Opp'n to Dr.

Augdahl's Mot. for Summ. J. ("Pl.'s Augdahl Resp."), ECF No. 173; Pl.'s Suppl. Exs., ECF

No. 174.) Having considered the entire summary-judgment record and the governing legal

standards, the Court concludes that there are no genuine issues of material fact and no reasonable

jury could find in favor of Mr. Fields.

### A.  Eighth Amendment Claim

Mr. Fields claims that the DOC Defendants were deliberately indifferent to his serious

medical needs by: (1) preventing him from receiving therapy from a female therapist; (2) failing

to provide him treatment for a paraphilic disorder or sexual exhibitionism; and (3) improperly

diagnosing his conditions. He also claims that Dr. Augdahl was deliberately indifferent to his

serious medical needs by taking him off Lexapro, which was needed to treat his depression.

Mr. Fields's allegations that he was denied constitutionally adequate mental-health care are best

analyzed as claims that the defendants violated his Eighth Amendment right to be free from cruel

and unusual punishment.

To prevail on his Eighth Amendment claims, Mr. Fields is required to "prove that he

suffered from one or more objectively serious medical needs, and that prison officials actually

knew of but deliberately disregarded those needs." *Roberts v. Kopel*, 917 F.3d 1039, 1042 (8th

Cir. 2019) (quoting *Roberson v. Bradshaw*, 198 F.3d 645, 647 (8th Cir. 1999)). To establish that

the medical need at issue is "objectively serious," Mr. Fields must demonstrate that his medical

need is "either obvious to the layperson or supported by medical evidence, like a physician's

18

diagnosis." *Id.* (quoting *Roberson*, 198 F.3d at 648). There must be evidence that the defendants "knew that [Mr. Fields] faced a substantial risk of serious harm and did not respond reasonably to that risk." *Id.* Proof that the defendants were deliberately indifferent to his medical needs requires evidence showing that they had "a mental state 'akin to criminal recklessness.'" *Id.* (quoting *A.H. v. St. Lous Cty., Mo.*, 891 F.3d 721, 726 (8th Cir. 2018)).

A prisoner like Mr. Fields has a constitutional right to receive adequate medical care, but he does not have a "'right to receive a particular or requested course of treatment.'" *Barr v. Pearson*, 909 F.3d 919, 921 (8th Cir. 2018) (quoting *Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997)). Moreover, "'[a] prisoner's mere difference of opinion over matters of expert medical judgment or a course of treatment fail[s] to rise to the level of a constitutional violation.'" *Id.* (quoting *Meuir v. Greene Cty. Jail Emps.*, 487 F.3d 1115, 1118–19 (8th Cir. 2007)).

### 1.  DOC Defendants

The DOC Defendants are entitled to summary judgment on Mr. Fields's Eight Amendment claims for several reasons. First, on this evidentiary record, no reasonable jury could conclude that Mr. Fields has been diagnosed with a paraphilic disorder or sexual exhibitionism. The evidence before the Court conclusively establishes the absence of such a diagnosis, which means that his Eighth Amendment claim against the DOC Defendants fails because he cannot prove an objectively serious medical need. *See Roberts*, 917 F.3d at 1042 (indicating that the first prong of a deliberate-indifference claim—the existence of an objective serious medical need—can be established with medical evidence, such as a diagnosis).

Second, this is not a case in which a reasonable jury could conclude that Mr. Fields had a serious medical need that was "so obvious that a layperson would easily recognize the need for

treatment." *Jones v. Minn. Dep't of Corr.*, 512 F.3d 478, 482 (8th Cir. 2008). Mr. Fields has filed

several documents discussing the diagnostic criteria for the disorders from which he claims to

suffer, and he has marked up those documents to indicate that he exhibited several of the signs

that correspond to exhibitionism and paraphilia. (*See* Pl.'s Exs., ECF No. 154.) Essentially,

Mr. Fields argues that his behavior so aligns with those diagnostic criteria that his need to

receive treatment tailored to paraphilia or exhibitionism was so obvious that an ordinary person

would recognize it. However, no evidence in the record supports this argument. Moreover, in the

cases where a serious medical need has been found to be so obvious that a layperson would

recognize the need for treatment are very distinct from Mr. Fields's situation. Indeed, here, the

plaintiff claims that prison officials relied upon medical judgments that an inmate should receive

treatment for mental-health concerns, but not those assessed by the prisoner himself.[4]

Ultimately, Mr. Fields is attempting to establish an objective serious medical need based

upon only his own self-diagnosis. Throughout his administrative disputes with DOC personnel

about the nature of treatment he received, Mr. Fields asserted that he suffers from paraphilic

disorder and sexual exhibitionism. He has reiterated these self-diagnoses as a basis for his Eighth

Amendment claims in this litigation. But his unsupported assessment alone is insufficient to

---

[4]       In *Jones*, the Eighth Circuit identified cases where a layperson would obviously know
that treatment was required for a serious medical need:

> This court has found a serious medical need that was obvious to a layperson
> where an inmate: was pregnant, bleeding, and passing blood clots ...; had swollen
> and bleeding gums and complained of extreme tooth pain ...; experienced
> excessive urination, diarrhea, sweating, weight loss, and dehydration related to
> known diabetes ...; or exhibited signs of early labor and her medical records
> clearly documented a history of rapid labor and delivery....

512 F.3d at 482 (internal citations omitted). The evidence in this case presents a starkly different
situation than those listed in *Jones*.

create a genuine fact issue for trial on the objective prong of his Eighth Amendment claim. *See, e.g.*, *Weaver v. Lombardi*, No. 4:15-cv-0018 (CEJ), 2015 WL 7253059, at *2–3 (E.D. Mo. Nov. 17, 2015) (granting defendant's motion for summary judgment where the plaintiff failed to establish an objectively serious medical need because he offered only his unsupported self-diagnosis that he suffered from attention deficit hyperactivity disorder); *Roberson v. Goodman*, 293 F. Supp. 2d 1075, 1080–81 (D.N.D. 2003) (rejecting Eighth Amendment claim as a matter of law where the plaintiff provided no evidence beyond his own self-diagnosis concerning allegedly adverse side effects of psychotropic medication); *see also Givens v. Jones*, 900 F.2d 1229, 1232 (8th Cir. 1990) ("Certainly physicians do not, and should not, necessarily accept as true the medical judgments offered by their patients. They must make treatment decisions on the basis of a multitude of factors, only one of which is the patient's input.").

Third, Mr. Fields's claim that the DOC Defendants exhibited deliberate indifference to his legitimate mental-health needs by denying his requests to be treated by female providers fails as a matter of law. Essentially, this aspect of his Eighth Amendment claim is a bare disagreement with a treatment decision made by his providers. As discussed above, several of his providers concluded that Mr. Fields feigned symptoms and engaged in other manipulative conduct to gain access to female therapists so he could pursue sexual interests in them. Mental-health professionals concluded there was no therapeutic need for Mr. Fields to receive treatment from female providers and that he was capable of controlling his behaviors if he chose to do so. They also noted on several occasions that granting his requests to be seen by female therapists would be problematic because of his disciplinary violations and history of inappropriate conduct toward them. Mr. Fields's disagreement with those assessments and his assertion to the contrary—that his treatment *requires* him to meet with women—are insufficient, as a matter of law, to support

21

an Eighth Amendment deliberate-indifference claim.[5]  *Barrow v. Buren*, No. 9:12-cv-1268

(MAD/CFH), 2015 WL 417084, at *17 (N.D.N.Y. Jan 30, 2015) (rejecting the plaintiff's Eighth

Amendment claim for failure to treat exhibitionism because his claims demonstrated only a

"[d]isagreement over the appropriate programming").

Moreover, based on the record here, a reasonable jury could only conclude that the

decision to prohibit Mr. Fields from meeting with female therapists at various times during his

incarceration was a legitimate reaction to his behavior. In his submissions opposing summary

judgment, Mr. Fields accuses the DOC Defendants of falsifying his mental-health records,

failing to include information that supports his claims that he needed to receive treatment from

female therapists, and fraudulently concluding that he engaged in conduct violating prison

disciplinary rules.[6]  However, Mr. Fields offers no evidence to support the assertion that any

record has been falsified or that the concerns identified in his treatment and disciplinary records

are illegitimate. *Petzold v. Rostollan*, No. 5:15-cv-163, 2017 WL 9280070, at *13 (E.D. Tex.

July 14, 2017) ("Unsupported assertions that a medical record has been falsified are insufficient

to create a genuine issue of material fact concerning the medical care received by a prisoner as

reflected in the record."), *aff'd by*, No. 5:15-cv-163, 2017 WL 4324737 (E.D. Tex. Sept. 29,

---

[5]    The same conclusion applies to Mr. Fields's contentions that he should have been
provided sex-offender treatment because this claim amounts to nothing more than a disagreement
about the nature of programming he believes he should receive for his mental-health issues.

[6]    *See* Pl.'s DOC Opp'n at 2 (alleging falsification of records regarding exhibitionism); *id.*
at 3 (alleging forged dates on discipline reports and withdrawal of disciplinary violations to
cover up treatment); *id.* at 5 (asserting that 2005 report he intended to assault Ms. Richter was
later proven to be a lie and that allegedly threatening letters were merely jokes or "driving"); *id.*
at 7 (denying that he engaged in several specific incidents of threatening behavior reflected in the
DOC Defendants' evidence); *id.* at 20 (asserting that his kites, letters, etc., including sexual
fantasies were not serious); ECF No. 154-3 at 1–4 and ECF No. 154-4 at 9, 11, 13, 14, 15 (noting
disagreements with conclusions that he violated prison disciplinary rules).

2017); *Jones v. Hendricks*, 173 Fed. App'x 180 (3d Cir. 2006) (finding prisoner failed to meet burden of showing genuine issue for trial despite claim of falsification of prison documents because the prisoner failed to offer any material challenging veracity of prison files). His claim that Director Lopez threatened and coerced him into signing an agreement that he would not engage in sexually inappropriate conduct during any treatment session is also unsupported by any admissible evidence in the record.

Finally, there is no evidence before the Court from which a reasonable jury could conclude that the DOC Defendants ignored Mr. Fields's mental-health treatment or refused to provide him care. In fact, the evidence in the record establishes that the opposite is true. As the discussion above recounts in detail, the DOC provided Mr. Fields mental-health treatment consistently throughout his incarceration, despite his relentless efforts to make doing so extremely difficult. While he was in administrative segregation for a lengthy period, he received regular checkups on his mental-health status. He frequently submitted kites seeking mental-health treatment, and although his persistent requests to have female providers meet with him were rejected, the records show that his requests for mental-health care were honored, albeit by male providers with whom he did not want to meet. On these undisputed facts, no reasonable jury could conclude that the DOC Defendants ignored or refused to treat any objectively serious medical need or exhibited a mental state akin to criminal recklessness with respect to any aspect of his mental-health care.

For all these reasons, the DOC Defendants are entitled to summary judgment on Mr. Fields's Eighth Amendment claims.

### 2. Dr. Augdahl

Dr. Augdahl is also entitled to summary judgment on Mr. Fields's Eighth Amendment claims. With respect to the claim that Dr. Augdahl violated his right to adequate care by discontinuing a prescription for Lexapro, the evidence establishes that Dr. Augdahl made a clinical judgment that the medication should be discontinued. Dr. Augdahl originally diagnosed Mr. Fields with a depressive disorder, but later changed that diagnosis and concluded there was an insufficient basis to diagnose Mr. Fields with a depressive disorder. Dr. Augdahl further made the clinical judgment that the prescription for Lexapro was contributing to Mr. Fields's hypersexual behavior. Even if Dr. Augdahl's judgment was wrong and he misdiagnosed that Mr. Fields did not suffer from a depressive or anxiety disorder, the undisputed evidence would not permit a reasonable jury to conclude that Dr. Augdahl was deliberately indifferent to Mr. Fields's serious medical needs. *See Estate of Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir. 1995) (noting that a plaintiff must show "more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation").

In his opposition to Dr. Augdal's motion for summary judgment, Mr. Fields offers only his own disagreement with Dr. Augdahl's treatment decisions and unsupported assertions that Dr. Augdahl falsified treatment notes to justify keeping Mr. Fields in segregated custody for illegitimate disciplinary decisions. (Pl.'s Augdahl Resp. at 1–2.) For example, in response to Dr. Augdahl's judgment that Lexapro may have been contributing to hypersexualization, Mr. Fields declares that "Plaintiff's Lexapro medication without a doubt was not any reason sexual kites were written." (Pl.'s Augdahl Resp. at 2; *id.* at 6 ("In this case Dr. Augdahl stopped my Lexapro not because I wasn't suicidal nor not depressed—he stopped my medication because

24

I had a[n] argument with a nurse and writing her was how I got back at her.").) As noted above, neither a disagreement over the course of treatment nor unsupported assertions that a defendant falsified medical records is sufficient to support an Eighth Amendment deliberate indifference claim.

Mr. Fields has also alleged that Dr. Augdahl discontinued all medication that he had been prescribed for hypertension. (Am. Compl. ¶ 61.) However, Mr. Fields has not provided any evidence that Dr. Augdahl ordered him to be taken off of any medication that was prescribed to treat hypertension. Dr. Augdahl's treatment notes indicate that he was prescribed Cozaar, an anti-hypertensive drug. (Novak Aff., Ex. A at 4.) Mr. Backes's February 22, 2016 assessment indicates that when Dr. Augdahl decided to discontinue Lexapro in October 2015, "[i]t was also suggested that his medciations prescribed through his general care physician be condensed into fewer med passes in an effort to curtail Mr. Fields' verbally abusive behavior toward nursing staff." (Novak Aff., Ex. B at 6.) But Mr. Fields has not pointed to any evidence in the record to support his assertion that Dr. Augdahl discontinued an order for hypertension medication. The unsupported allegations in Mr. Fields's Amended Complaint and in his legal memoranda are insufficient to support this claim.

For these reasons, the Court concludes that Dr. Augdahl is entitled to summary judgment on Mr. Fields's Eight Amendment deliberate-indifference claim

## B. Fourteenth Amendment Equal Protection Claim

As discussed above, Mr. Fields also asserts that the defendants denied him the mental-health treatment he requested because of his race. He claims that the DOC Defendants refused to allow him to see a female therapist, required him to be escorted to medical appointments by a corrections officer, and disciplined him for attempting to masturbate in front of female staff

25

while they treated similarly situated inmates of other races differently. (Pl.'s Letter to Menendez, M.J. at 2, 3 (asserting that he has been prevented from meeting with female therapists like other non-African American inmates and claiming that other inmates are allowed to discuss sexual fantasies with female therapists); Pl.'s DOC Opp'n at 6–7 (claiming plaintiff is treated differently than similarly situated inmates).) Similarly, he asserts that Dr. Augdahl refused to diagnose him with a depressive disorder as part of a conspiracy to minimize his conditions while treating white inmates accused of inappropriate sexual conduct differently. (Pl.'s DOC Opp'n at 8, 12–13 (asserting that Dr. Augdahl conspired to with DOC officials to downplay his mental-health issues and instructed white inmates to masturbate in front of female staff members, but only those who enjoyed watching such behavior); Pl.'s Augdahl Resp. at 8–9.)

A plaintiff in a § 1983 case who claims to have been subjected to racial discrimination in violation of his equal-protection rights under the Fourteenth Amendment must show "intentional or purposeful discrimination." *Lewis v. Jacks*, 486 F.3d 1025, 1028 (8th Cir. 2007) (internal quotation marks omitted). To defeat the defendants' motions for summary judgment, Mr. Fields must "identify affirmative evidence from which a jury could find proof of the pertinent motive, race discrimination." *Id.* (internal quotation marks omitted). Proving such a motive usually is accomplished by providing "evidence that similarly situated inmates were treated differently." *Id.*

Although Mr. Fields asserts that white inmates (and other non-white inmates who are not African American) were treated differently, he has provided no evidence in support of his claims. Mr. Fields has not identified a single other inmate of any race who, like him, engaged in a relentless history of inappropriate sexual conduct toward female DOC staff, but who continued to meet with female therapists or were allowed to engage in the type of conduct he claims has

been forbidden in his case. (*See* ECF No. 69 at 5–6 (claiming that other inmates who have the same conditions as he does are allowed to meet with female therapists and engage in "role playing [that] includes masturbation ... [y]et I'm denied the same services because I'm black"); Pl.'s DOC Opp'n at 20 ("Defendants are deliberately keeping women away from me but not whites.").)[7]  Similarly, Mr. Fields fails to identify any similarly situated inmate for whom Dr. Augdahl provided different care. Absent some affirmative evidence that an inmate of a different race engaged in similar inappropriate conduct—threatening communications to female staff, harassing letters with personal details, expression of sexual fantasies toward treatment providers, sexual assault of a nurse, etc.—but was allowed to continue meeting with a female therapist despite that conduct, a reasonable jury could not infer that the DOC Defendants made the decisions they did based on Mr. Fields's race. As noted above, the record here fully supports the conclusion that the DOC Defendants imposed the restrictions on the gender of Mr. Fields's mental-health providers and required an escort for all his medical appointments based on his lengthy history of inappropriate sexual behaviors. *See* discussion, *supra*, at p. 26–27 (concluding that the evidence shows the decision to prohibit Mr. Fields from meeting with female therapists at various times during his incarceration was a legitimate reaction to his own behavior). Nor could a reasonable jury infer from this record that Dr. Augdahl provided diagnoses or rendered treatment decisions based on Mr. Fields's race without any indication that a similarly situated inmate received different care.

---

[7]    The only admissible evidence before the Court at this time indicates that the DOC does not have mental-health treatment programming of any kind that allows any inmate to engage in the type of sexual behavior during treatment that Mr. Fields claims he is entitled to pursue. (Huot Aff. ¶ 9.)

Accordingly, the Court concludes that the DOC Defendants and Dr. Augdahl are entitled to summary judgment on Mr. Fields's Equal Protection claims.

## IV.    Recommendation

For all the reasons discussed above, **IT IS HEREBY RECOMMENDED THAT**:

1.    The DOC Defendants' Motion for Summary Judgment **(ECF No. 115)** should be **GRANTED**;

2.    Defendant Lon Augdahl, M.D.'s Motion for Summary Judgment **(ECF No. 161)** should be **GRANTED**; and

3.    This action should be **DISMISSED WITH PREJUDICE**.

Date: July 23, 2019                              *s/Katherine Menendez*
                                                 Katherine Menendez
                                                 United States Magistrate Judge

## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.